# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30267

United States Court of Appeals
Fifth Circuit

**FILED**
May 24, 2019

Lyle W. Cayce
Clerk

MORGAN WEBB; BRIANA WEBB,

      Plaintiffs - Appellants

v.

TOWN OF SAINT JOSEPH; EDWARD L. BROWN,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana

Before HIGGINBOTHAM, SOUTHWICK, and COSTA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Ivan Webb sued the Town of St. Joseph and its Mayor, arguing that they violated his federal and state constitutional rights by seeking—and then seeking to collect on—a judgment that he owed over $50,000 for violating a local ordinance. The district court concluded that the criteria for municipal liability were not met and that the Mayor was at least entitled to qualified immunity. We affirm summary judgment on the federal § 1983 claims, and vacate and remand the state-law claim.

**I**

This case has a convoluted procedural history spanning both state and federal court. It began straightforwardly, however: in November 2006, Ivan

No. 17-30267

Webb petitioned the St. Joseph Board of Aldermen for a permit to place a mobile home on his father's property.[1] He also requested the right to place additional mobile homes on the property in the future.[2] Although the Board only granted him a permit to place one mobile home on the property, Webb placed a second home without a permit.[3] St. Joseph issued Webb a ticket for violating a local ordinance providing that "[n]o building or other structure shall be built or constructed in the Town of St. Joseph without there first being obtained a permit from the Mayor and Board authorizing or approving the construction of such building or other structure."[4] Webb then applied for and was denied a second permit.[5]

An assortment of court proceedings followed. The permit violation was first tried before the Mayor's Court, which found that Webb had violated the ordinance by placing a second mobile home on the property.[6] It ordered Webb to pay a fine of $100 per day beginning February 14, 2007, until he removed the second trailer from the lot.[7] Webb appealed to state district court, which held a de novo trial and also sided with St. Joseph.[8] The district court entered a $58,200 judgment for St. Joseph—"representing the fine of $100 per day for each of the 582 days from February 14, 2007 through the date of trial,

---

[1] *See Webb v. Town of St. Joseph* (*Webb I*), 560 F. App'x 362, 363 (5th Cir. 2014) (per curiam).

[2] *Id.*

[3] *Id.*

[4] *Id.* Although the ticket was initially issued on February 7, 2007, the Chief of Police remedied the error by certified letter on February 14, 2017. *See Town of St. Joseph v. Webb*, 87 So. 3d 958, 960 (La. Ct. App. 2012).

[5] *See Town of St. Joseph*, 87 So. 3d at 960.

[6] *See Webb I*, 560 F. App'x at 363–64. The Mayor did not preside due to a conflict of interest. Instead, the Louisiana Supreme Court appointed a state trial court judge to preside. *See Town of St. Joseph*, 87 So. 3d at 960.

[7] *See Webb I*, 560 F. App'x at 363–64.

[8] *See id.* at 364.

No. 17-30267

September 18, 2008." Webb's appeal of this decision was dismissed due to his failure to pay court fees.[9]

At this point, St. Joseph officials attempted to collect on the $58,200 judgment. The Town Attorney, Karl Koch, filed a motion in the state district court for execution by writ of *fieri facias*, which allowed St. Joseph to seize and attempt to sell two lots belonging to Webb.[10] One of the lots was sold at a sheriff's sale, while the other was not ultimately sold. St. Joseph's mayor, Edward L. Brown, also sent Webb a letter notifying him that his alderman's wages—$500 a month—would be entirely withheld as a setoff on the money he owed the town.

Webb moved to annul the judgment, arguing that the matter had exceeded the Mayor's Court's jurisdictional limits and that the ordinance did not apply to mobile homes.[11] The district court denied the motion.[12] Webb suspensively appealed to the Louisiana Second Circuit Court of Appeal, which ruled in his favor in March 2012 and annulled the district court's judgment.[13] It held that although the Louisiana Constitution required Webb to be given reasonable notice of the charge against him, the ticket issued to Webb and the complaint filed against him in the Mayor's Court accused him only of violating a single offense.[14] The Second Circuit Court of Appeal therefore held that "the imposition of a fine of $58,200 for violations of the ordinance for 582 days constituted an illegal sentence," concluded that it could correct an illegal

---

[9] *See id.*

[10] *See id.*

[11] *See Town of St. Joseph*, 87 So. 3d at 961.

[12] *See id.*

[13] *See id.* at 963.

[14] *See id.* at 962–63.

3

No. 17-30267

criminal sentence at any time, and reduced the fine to $100 for a single violation of the ordinance.[15]

St. Joseph still withheld Webb's alderman's wages after the Second Circuit Court of Appeal annulled the judgment, while it sought a writ of review from the Louisiana Supreme Court. The decision became final once the Louisiana Supreme Court denied the application for review in June 2012.[16] For three months, St. Joseph continued to withhold wages and did not immediately offer Webb backpay for the wages that had already been withheld. The Webbs allege that Mayor Brown made an intentional decision to continue withholding his wages and backpay even after the judgment was annulled, while the defendants contend that this was the result of an "oversight."

As for Webb's properties, one of the lots was never sold and St. Joseph notified him that the writ of *fieri facias* on that lot had expired. The other lot had already been sold at a sheriff's sale, and St. Joseph reimbursed Webb $792 for the amount that the Town received from the sale. Webb suggests that he is owed more from the sale and is owed rental income that he could have made from both properties. The defendants counter that Webb's attorney in fact argued against voiding the original sale after a lawyer for the Sheriff had identified a potential legal problem, since the property was sold to Webb's brother.

In October 2012, Webb sued St. Joseph and Mayor Brown in federal court, seeking damages for violations of his federal and state constitutional rights. After Webb filed his federal suit, St. Joseph offered him $10,486.54 in backpay for the withheld wages in October 2012. Webb interpreted this as

---

[15] *See id.* at 963.

[16] *See Town of St. Joseph v. Webb*, 91 So. 3d 976 (La. 2012) (mem.).

No. 17-30267

contingent on his settling the case and did not initially accept the money. By February 2013, however, Webb accepted the return of his wages.

The district court initially granted St. Joseph's motion to dismiss Webb's complaint as barred by res judicata, reasoning that Webb could have brought the same claims or causes of action in his state court suit to annul the original judgment.[17] We reversed, holding that when properly resolving any doubts against applying res judicata in favor of Webb, there was insufficient evidence that Webb could have brought the same claims or causes of actions in his state lawsuit.[18] For example, Webb had alleged "violations of his rights based on conduct that necessarily occurred *after* the [state] appellate decision," such as "that the Town continued to enforce the illegal sentence, retained the proceeds that resulted from the sale of one of Webb's properties seized by the Town pursuant to the writ of *fieri facias*, and withheld Webb's salary until October 2012."[19]

Webb passed away in 2015 and his heirs, Morgan and Briana Webb, were substituted as plaintiffs. On cross-motions for summary judgment, the district court granted summary judgment to St. Joseph and to the Mayor in his individual capacity. It also denied the Webbs' motion to disqualify the Town Attorney from representing the defendants. The Webbs appeal.

## II

We review the district court's grant of summary judgment de novo.[20] "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[17] *See Webb v. Town of St. Joseph*, No. 12-02644, 2013 WL 2617090 (W.D. La. June 11, 2013).

[18] *See Webb I*, 560 F. App'x at 366–67.

[19] *Id.* at 367.

[20] *See Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc).

No. 17-30267

as a matter of law.'"[21] "We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[22]

A claim under 42 U.S.C. § 1983 has two foundational elements: "a violation of the Constitution or of federal law, and . . . that the violation was committed by someone acting under color of state law."[23] The Webbs' § 1983 claim against St. Joseph must meet the requirements for municipal liability established by *Monell v. Department of Social Services*[24] and its progeny. As their § 1983 claim against Mayor Brown in his individual capacity is subject to his qualified immunity defense, they must show that his actions "were objectively unreasonable in light of clearly established law at the time of the violation."[25]

## III

We turn first to the Webbs' claim against St. Joseph. While municipalities can be sued directly under § 1983, *Monell* establishes that they "cannot be found liable on a theory of vicarious liability or respondeat superior."[26] In other words, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability."[27] To overcome summary judgment on a

---

[21] *Id.* (quoting Fed. R. Civ. Proc. 56(a)).

[22] *Id.* (quoting *State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 844 (5th Cir. 2017)).

[23] *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019).

[24] 436 U.S. 658 (1978).

[25] *Sims v. City of Madisonville*, 894 F.3d 632, 638 (5th Cir. 2018) (per curiam).

[26] *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (citing *Monell*, 436 U.S. at 690–91).

[27] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *accord Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015).

municipal liability claim, a plaintiff must therefore "demonstrate a dispute of fact as to three elements: that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."[28]

## A

Our caselaw establishes three ways of establishing a municipal policy for the purposes of *Monell* liability. First, a plaintiff can show "written policy statements, ordinances, or regulations."[29] Second, a plaintiff can show "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."[30] Third, even a single decision may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."[31]

The Webbs do not allege any written municipal policy or widespread practice. Instead, their argument centers on whether an official with "final policymaking authority" took the actions underpinning their § 1983 claim—namely, the initial effort to obtain a judgment penalizing Webb for 582 days of violations rather than a single day, coupled with the related effort to collect on that judgment by withholding Webb's alderman's wages and seizing his property. We therefore will focus our inquiry on this issue.

---

[28] *Davidson*, 848 F.3d at 395.

[29] *Alvarez*, 904 F.3d at 389–90.

[30] *Id.* at 390.

[31] *Davidson*, 848 F.3d at 395 (citing, *e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482, 484–85 (1986)); *see also Anderson v. City of McComb*, 539 F. App'x 385, 388 n.2 (5th Cir. 2013) ("When the policymakers are the violators, no further proof of municipal policy or custom is required.").

No. 17-30267

**B**

"[A] final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983."[32] This requires the "*deliberate* choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question*."[33] Therefore, the "critical question" is generally "to decide who is the final policymaker, which is an issue of state law."[34]

Our inquiry does not end where state law does not establish the relevant actor as a final policymaker, however. A municipal employee may also possess final policymaking authority where the final policymaker has delegated that authority, either expressly or impliedly.[35] Not all delegations of authority are delegations of *policymaking* authority—"[w]e have long recognized that the 'discretion to exercise a particular function does not necessarily entail final policymaking authority over that function.'"[36]

The Webbs argue that St. Joseph's liability is grounded in the actions of two officials, the Town Attorney and Mayor Brown. We address in turn

---

[32] *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997) (quoting *Pembaur*, 475 U.S. at 481).

[33] *Garza v. City of Donna*, 922 F.3d 626, 638 (5th Cir. 2019) (quoting *Pembaur*, 475 U.S. at 483–84) (first emphasis added).

[34] *Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 166 (5th Cir. 2016) (citing *Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993)).

[35] *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010).

[36] *Valle v. City of Houston*, 613 F.3d 536, 542–43 (5th Cir. 2010) (quoting *Bolton v. City of Dallas*, 541 F.3d 545, 549 (5th Cir. 2008) (per curiam)); *see Zarnow*, 614 F.3d at 167 ("There is a fine distinction between a policymaker and a decisionmaker."); *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc) ("Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance.").

whether each is a "final policymaker" whose one-time actions could generate municipal liability.

**1**

The Town Attorney took most of the actions relevant to this case. He filed the initial charge against Webb; pursued a judgment through the Louisiana courts; and initiated proceedings to collect on the judgment, including by seeking writs of *fieri facias* on Webb's properties. If the Town Attorney acted as a final policymaker, we would easily conclude that these actions could ground municipal liability. We ultimately agree with the district court, though, that the Town Attorney was not a final policymaker for St. Joseph.

We first look to where state law rests policymaking authority, considering "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law."[37] The relevant statute provides only that the municipal attorney's "duties in such capacity may include representation of all municipal officers . . . in actions against them in connection with and arising out of their functions as such officers, and other duties as prescribed by the mayor."[38] This suggests that the Town Attorney was authorized to act in a representative—not policymaking—capacity, and the Webbs present no evidence that state or local custom imbued the Town Attorney with general policymaking authority. In cases where an attorney has been treated as a local government policymaker, there was substantially clearer vesting of such authority or other unique circumstances not present

---

[37] *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted).

[38] La. Rev. Stat. § 33:386(C).

No. 17-30267

here.[39] Indeed, the Webbs at points appear to concede that the Town Attorney does not inherently hold policymaking authority for St. Joseph.

Instead, the Webbs principally argue that Mayor Brown delegated his final policymaking authority to the Town Attorney. They cite his affidavit, where he described how he "left the decisions regarding how to proceed with the litigation against Ivan Webb up to the Town Attorneys" and how, even though he "directed the [Town Attorney] to proceed with the collection efforts, he "left the decisions about how to conduct these legal proceedings up to the Town's attorney . . . [and] expected that the Town's attorney would only come to [him] for decisions about matters which required a decision by the client." They also reference Louisiana law providing that a town's mayor, as the "chief executive officer of the municipality,"[40] may "delegate the performance of administrative duties to such municipal officers or employees as he deems necessary and advisable."[41] In sum, they suggest that once the Mayor left decisions about how to collect the judgment against Webb up to the Town Attorney, the Town Attorney became a final policymaker.

---

[39] *See Pembaur*, 475 U.S. at 484–85 (observing that Ohio law authorized a county prosecutor not just to render legal advice, but also to instruct county officers "in matters connected with their official duties"); *Culbertson v. Lykos*, 790 F.3d 608, 624 (5th Cir. 2015) (observing that a district attorney "arguably" was a final policymaker in the specific area of determining what witnesses to use in prosecutions, though not deciding the issue); *Turner v. Upton County*, 915 F.2d 133, 137–38 (5th Cir. 1990) (concluding that a county could be liable for the actions of a district attorney, not because the district attorney was an authorized policymaker for the county, but because he was a member of a conspiracy including the county sheriff— who *was* an authorized policymaker); *cf. Bennett*, 728 F.2d at 769 (concluding that a city attorney had no policymaking authority because he was "employed only to give legal advice").

[40] La. Rev. Stat. § 33:362(B).

[41] *Id.* § 33:404(A)(2).

## No. 17-30267

This argument conflates policymaking authority with decision-making authority, something our caselaw counsels against.[42] A true policymaker must "decide the goals for a particular city function and devise the means of achieving those goals."[43] We see no indication that the Town Attorney was given final policymaking authority in this vein, beyond a grant of *decision-making* authority to pursue the goal of enforcing the city ordinance and collecting the judgment. Although the Town Attorney had the discretion to make certain decisions about how to pursue St. Joseph's judgment against Webb, "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior*."[44] The wrongful conduct alleged by the plaintiffs on the part of the Town Attorney therefore does not fall into the narrow category of action by a final policymaker that can *by itself* ground municipal liability.

**2**

This raises the natural question of whether the *Mayor's* status as a final policymaker could ground § 1983 liability on the part of St. Joseph.[45] Even when an official with final policymaking authority does not directly act to set policy, a municipality may be liable in "extreme factual situations" when that official ratifies a subordinate's decision, which requires more than the defense of a decision or action shown to be unconstitutional after the fact.[46] A municipality may also be liable when a policymaker engages in deliberately indifferent failure to control subordinates in a way likely to result in violation

---

[42] *See Valle*, 613 F.3d at 543–44 ("Although [the relevant ordinances] confer decisionmaking or operational command authority on [the official], it does not follow that [the official] . . . acts in a policymaking capacity."); *Bolton*, 541 F.3d at 548–50.

[43] *Bennett*, 728 F.2d at 769; *accord Zarnow*, 614 F.3d at 167.

[44] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion).

[45] The parties appear to agree that Mayor Brown qualifies as a final policymaker for the purposes of municipal liability.

[46] *See Davidson*, 848 F.3d at 395–96.

11

of constitutional rights.[47] The Webbs do not argue, however, that Mayor Brown was deliberately indifferent in failing to control the Town Attorney—nor do they argue that Mayor Brown subsequently ratified the Town Attorney's actions.[48] We have held that such arguments can be waived.[49] On the record and arguments before us, we cannot conclude that the plaintiffs have established a genuine fact issue over whether St. Joseph can be held liable for its mayor's *indirect* actions in failing to supervise, or subsequently ratifying, its Town Attorney's conduct.

The question therefore becomes whether Mayor Brown, acting as a final policymaker, himself made decisions that threatened Webb's constitutional rights. The Webbs argue that the Mayor took three categories of actions that can ground municipal liability: first, he was generally involved as a

---

[47] *See Alvarez*, 904 F.3d at 390 ("To base deliberate indifference on a single incident, 'it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy.'" (quoting *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003)).

[48] The Webbs fleetingly argue that St. Joseph is liable because Mayor Brown "approv[ed] the acts of the Town Attorney," but present no further argument on this point. This is not enough to demonstrate the sort of "extreme factual situation" where ratification applies. *See, e.g., Culbertson*, 790 F.3d at 621 ("If a final policymaker approves a subordinate's recommendation *and also the subordinate's reasoning*, that approval is considered a ratification chargeable to the municipality. This theory of ratification has been limited to 'extreme factual situations.'" (emphasis added and citations omitted)); *Okon v. Harris Cty. Hosp. Dist.*, 426 F. App'x 312, 317 n.10 (5th Cir. 2011) (per curiam) ("Only if the authorized policymakers approve a subordinate's decision *and the basis for* it would their ratification be chargeable to the municipality." (internal quotation marks omitted)); *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) (finding no ratification where a policymaker "determined after investigation that [the challenged conduct] complied with the department's policies"); *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (suggesting that ratification might occur if the supervisor explicitly ratified or defended a subordinate's actions and "the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law").

[49] *See Valle*, 613 F.3d at 544 & n.5 (holding that litigants waived their ratification argument by failing to raise it in their opening brief).

policymaker throughout the decision-making process; second, he personally initiated the withholding of Webb's alderman's wages; and third, he was responsible for the failure to stop withholding Webb's wages and to return the wages already withheld until three months after the annulment of the judgment became final.[50]

We have no difficulty concluding that the Webbs failed to present sufficient summary judgment evidence that Mayor Brown was involved throughout the decision-making process in a way that would generate municipal liability, especially in light of the simultaneous suggestion that the Town Attorney had been delegated decision-making authority.[51] But the Webbs also argue that Mayor Brown took affirmative actions to impede Webb's constitutional rights, which poses a closer issue. They have presented sufficient evidence to support their allegation that Mayor Brown was personally involved in the *initial* decision to collect on the judgment, including by withholding Webb's alderman's wages—he conceded as much in his affidavit, and the letter informing Webb of the withholding came from and was signed by the Mayor. It is less clear, though, whether the Mayor made any affirmative decision to *continue* withholding Webb's wages—and not to return wages already withheld—until three months after the annulment became final. There is a paucity of evidence on both sides on this issue: Mayor Brown asserts only that this was the result of an "oversight" by his office, while the Webbs present no evidence to the contrary beyond arguing that a jury could

---

[50] There is no concrete suggestion that Mayor Brown was personally involved in the seizure of Webb's properties or subsequent attempts to sell them. Nor is there any indication that the Mayor made decisions regarding the language of the charging instrument or the nature of the judgment sought.

[51] *See, e.g.*, *Davidson*, 848 F.3d at 395 (observing that although a single action by a policymaker can establish municipal liability, this only occurs in "rare circumstances" where "a policymaker performs *the specific act* the forms the basis of the § 1983 claim" (emphasis added).

infer from a history of bad blood between Webb and the Mayor that the decision was no oversight. We ultimately conclude that the Webbs have not shown a fact issue over whether the continued withholding of Webb's wages was the result of a "*deliberate* choice to follow a course of action . . . made from among various alternatives by [the Mayor]."[52]

In sum, the Webbs argue that this falls into the narrow range of cases where municipal liability can stem from individual, one-off decisions by an authorized policymaker. They have not shown that the Town Attorney was a final policymaker for these purposes, and therefore have not shown that St. Joseph should be liable as a municipality for *his* discretionary decisions. It is possible that affirmative decisions made by the Mayor, rather than the Town Attorney, could have generated municipal liability. The only affirmative decision by Mayor Brown that the Webbs have adequately substantiated, however, was his initial decision to take efforts to collect on the—at that time, final—judgment. With our focus substantially narrowed, we therefore turn to whether *this decision* was the "moving force" behind a violation of a constitutional right.

## C

After establishing a sufficiently official municipal policy promulgated by an authorized policymaker, a plaintiff must then show that the policy was the "moving force" behind the constitutional violation.[53] This requires showing either that the policy itself was unconstitutional[54] or that it was adopted with

---

[52] *E.g.*, *Garza*, 922 F.3d at 638.

[53] *See Alvarez*, 904 F.3d at 390.

[54] *See Bryan Cty.*, 520 U.S. at 404 ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.").

deliberate indifference to the "known or obvious fact that such constitutional violations would result."[55]

As we have explained, the only potential municipal policy that could ground the Webbs' claim against St. Joseph arises from Mayor Brown's alleged decision, as a final policymaker, to *initially begin* undertaking efforts to collect on the judgment. The Webbs offer two arguments as to why this specific decision was unconstitutional.

First, the Webbs argue that it was impermissible for St. Joseph to withhold Webb's wages without formal garnishment procedures. The defendants aver that the withholding was authorized by Louisiana Civil Code article 1893, which allows for "compensation" by operation of law "when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due," such that "both obligations [are extinguished] to the lesser amount."[56] They argue that they were not required to institute formal garnishment procedures as a result. In response, the Webbs argue that this was inappropriate "self-help" to which St. Joseph was not entitled to resort in lieu of a formal statutory garnishment proceeding. They also observe that if St. Joseph had pursued garnishment, it would only have been able to seize 25% of Webb's alderman's wages, not the entirety of the wages. The Webbs point to no authority, though, that allows us to conclude that it violates federal constitutional law for a municipality to pursue one statutorily authorized mechanism to collect on a final judgment over another. In fact, they appear to

---

[55] *Shumpert v. City of Tupelo*, 905 F.3d 310, 316–17 (5th Cir. 2018), *as revised* (Sept. 25, 2018).

[56] La. Civ. Code art. 1893; *see also, e.g.*, *Richard v. Vidrine Auto. Servs., Inc.*, 729 So. 2d 1174, 1177–78 (La. Ct. App. 1999) (describing how an employer's claim for compensation can authorize setoffs against wages in certain circumstances).

concede that state-law limitations on garnishment do not generate a federal claim that could support § 1983 liability.

More broadly, the Webbs contend that the judgment was unconstitutional and that St. Joseph was therefore not authorized to take efforts to collect on it. They submit no caselaw, and we are not aware of any, establishing that a municipality violates constitutional rights when it undertakes efforts to collect on a final court judgment—albeit one later determined to be unconstitutional—by withholding wages in a manner authorized by law.[57] St. Joseph and its policymakers were initially entitled to rely on the judgment, rendered final by Webb's failure to perfect his appeal, and to undertake steps to collect on that judgment.

\* \* \*

A common thread running throughout the Supreme Court's and our own caselaw on municipal liability is that such liability "is limited to action for which the municipality is actually responsible."[58] The Webbs have painted a picture of poor decisions and bureaucratic dysfunction—but they have not established that *St. Joseph policy* was the moving force behind the violation of any constitutional right. We therefore affirm the district court's grant of summary judgment to St. Joseph on the Webbs' § 1983 claim.

## IV

The same analysis demonstrates why Mayor Brown is entitled to summary judgment on the claim against him in his individual capacity. As we

---

[57] At oral argument and in their briefing, the Webbs attempt to analogize this case to our decision in *Ballard v. Wall*, where we held that private attorneys could be liable under § 1983 as state actors when they allegedly conspired with a judge to essentially operate a "debtor's prison" to extract money from judgment debtors. 413 F.3d 510 (5th Cir. 2005). We do not extract from *Ballard* a principle that any effort to collect on a final judgment ultimately determined to be unlawful is unconstitutional.

[58] *Burge*, 187 F.3d at 471 (5th Cir. 1999) (quoting *Pembaur*, 475 U.S. at 479).

No. 17-30267

have explained, the summary judgment record does not support the Webbs' far-reaching allegations that the Mayor was personally involved throughout the challenged conduct. It also does not support their allegation that the Mayor deliberately withheld Webb's wages even after the judgment was finally annulled. They cite no evidence, for example, that Webb asked for his wages to be reinstated and was denied.[59] At most, the summary judgment evidence allows that the Mayor made the initial decision to pursue collection on the $58,200 final judgment. As in their arguments for municipal liability, however, the Webbs offer no way for us to conclude that *this specific action* by the Mayor violated Webb's constitutional rights—let alone that such action was unreasonable given clearly established law.[60] We will therefore also affirm the district court's grant of summary judgment to Mayor Brown on the § 1983 claim against him in his individual capacity.

Again, our decision is shaped by the arguments and evidence the Webbs have presented. They do not allege that Mayor Brown is individually liable due to failure to supervise the Town Attorney or subsequent adoption of the Town Attorney's actions. And, while they do allege that Mayor Brown made the affirmative decision to continue withholding Webb's wages after the annulment became final, they do not present evidence sufficient to support this

---

[59] While Webb sent Mayor Brown a letter in May 2011 demanding the return of his alderman's wages, this was *before* the Second Circuit Court of Appeal annulled the judgment.

[60] Mayor Brown raises the defense of qualified immunity, which requires the Webbs to show "(1) that [he] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *E.g.*, *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014) (internal quotation marks omitted). Because we conclude that the Webbs have not adequately substantiated any concrete conduct on Mayor Brown's part that violated Webb's constitutional rights, we need not address the "clearly established" prong of qualified immunity.

conclusion. Perhaps on a different record, the Mayor would not be entitled to summary judgment on his individual liability. Not here.

## V

We must turn to two final housekeeping matters. First, the Webbs also argue that the district court erred in denying the motion to disqualify the Town Attorney from acting both as counsel and as a potential witness. We review this for abuse of discretion, assessing fact-finding for clear error and performing a "'careful examination,' or *de novo* review, of the district court's application of the relevant rules of attorney conduct."[61] In evaluating a motion to disqualify, "[a] court must take into account not only the various ethical precepts adopted by the profession but also the social interests at stake."[62]

Acknowledging that the relevant rules establish that a lawyer shall not act as advocate where the lawyer is also likely to be a necessary witness,[63] the district court concluded that the Town Attorney's testimony was unnecessary. It explained that details about the Town Attorney's motivations and reasoning were irrelevant to the fundamental question—whether the complained-of conduct emerged from a municipal policy established by an authorized policymaker. We find no abuse of discretion in the denial of the motion to disqualify.

---

[61] *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1311–12 (5th Cir. 1995).

[62] *Id.* at 1314 ("Among the factors that we have considered in the past are whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." (internal quotation marks omitted)).

[63] *See* ABA Model Rules of Prof'l Conduct 3.7(a); ABA Model Code of Prof'l Responsibility DR 5–101(B), 5–102(A). The relevant portion of the Model Rules of Professional Conduct is identical to Louisiana's rule concerning the propriety of counsel acting as a witness.

No. 17-30267

Second, the district court summarily dismissed Webb's state-law claim for violation of his right to be free of excessive fines under Article I, Section 20 of the Louisiana Constitution. Although the district court suggested that its analysis applied with "equal force" to the state-law claim, its discussion was otherwise specific to 42 U.S.C. § 1983. The decision did not address the merits of the Webbs' federal or state constitutional claims, instead resolving the individual-capacity claim on qualified immunity and the municipal-liability claim on the absence of culpable action by a final policymaker. These conclusions do not provide a sufficient basis for rejecting the state constitutional claim.

This said, the district court has discretion to decline to exercise supplemental jurisdiction over state-law claims, especially where the sole federal claims have been eliminated prior to trial.[64] We therefore vacate the summary judgment on the Webbs' state-constitution claim and remand for the district court to determine whether it is appropriate to continue to exercise federal jurisdiction over the state-law claim, and, if so, to address that claim more fully.

## VI

We affirm the district court's grant of summary judgment to both defendants on the Webbs' § 1983 claims. We vacate the grant of summary judgment on the Webbs' state constitutional claim, however, and remand for the district court to assess its jurisdiction over this claim.

---

[64] *See, e.g.*, *Mendoza v. Murphy*, 532 F.3d 342, 345–47 (5th Cir. 2008).