# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 21, 2023

Lyle W. Cayce
Clerk

No. 22-20019

St. Maron Properties, L.L.C.; Yang Su, doing business as Re-Mart Investment; John Winkler; Jose M. Gallegos,

*Plaintiffs—Appellants*,

*versus*

City of Houston; Ella Park Terrace Civic Club,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-900

---

Before Dennis, Elrod, and Ho, *Circuit Judges*.

James C. Ho, *Circuit Judge*:

A group of property owners alleges that the Mayor of Houston, the City Council, and the City Attorney concocted a scheme to trespass on and damage their properties to benefit neighboring residents—all without permission, compensation, or due process. The property owners allege that the City used their empty lots as a dumping ground for construction materials, thereby rendering their land unable to absorb water. As a result, neighboring residences were frequently flooded over subsequent decades. After numerous complaints from the neighboring residents, the Mayor and

No. 22-20019

City Council directed city officials to conduct various remediation efforts on the lots, thereby damaging the properties—all without the consent of the owners.

The property owners—Jose M. Gallegos, John Winkler, Yang Su (doing business as Re-Mart Investment), and St. Maron Properties—brought, *inter alia*, § 1983 claims against the City under the Takings Clause, the Due Process Clause, and the Equal Protection Clause, as well as state law tort and statutory claims. The district court dismissed the state law claims as barred by sovereign immunity. It also dismissed the § 1983 claims under Rule 12(b)(6) for failure to satisfy the requirements for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

We affirm the dismissal of the state law claims. But we reverse the dismissal of the § 1983 claims.

Under *Monell*, a § 1983 plaintiff may not proceed against a municipality unless the injury was caused by an official policy of the municipality. But here, the property owners allege that city officials violated their rights at the specific direction of the Mayor and the City Council.

That is enough to establish liability under *Monell*. "If the decision to adopt [a] particular course of action is properly made by th[e] government's authorized decisionmakers, it surely represents an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Accordingly, we hold that the property owners are entitled to proceed against the City on their federal claims.

## I.

For purposes of this appeal, we accept the factual allegations in Plaintiffs' complaint as true. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

2

No. 22-20019

Before Plaintiffs acquired the lots, the City used the land as a dumping ground for dirt and road construction debris. As a result, the land compacted into a mound raised eight-to-ten feet above the surrounding area. Because the debris was composed of clay and construction materials, the land was unable to soak up rainwater.

Ella Park Terrace is a subdivision bordering the lots. When it rains, water from the lots sheds onto the backyards of some Ella Park Terrace homes.

For decades, Ella Park Terrace residents have complained to the City about the resulting flooding. The City planned to remediate the flooding. But the plan fell apart when the City couldn't afford to compensate Ella Park Terrace homeowners for modifications to their backyards.

Eventually, the Houston Mayor brought the watershed issue to the City Council on behalf of the Ella Park Terrace Civic Club ("Ella Park"), a civic association comprised of subdivision residents. The City Council then directed the City Attorney's Office and Department of Public Works and Engineering ("Public Works") to find a means of alleviating the flooding.

With the Mayor's and City Council's support, the City Attorney's Office filed a lawsuit in county court on behalf of and in the name of Ella Park against Plaintiff Gallegos. The lawsuit shifted blame for the watershed from the City to Gallegos and sought injunctive relief accordingly. The City Attorney represented Ella Park in every aspect of the lawsuit. And the Mayor said on TV that "her legal team [was] throwing the [C]ity's muscle behind" Ella Park.

The lawsuit alleged that all of the lots belonged to Gallegos. Gallegos never appeared or answered. But the county court entered a permanent injunction anyway. The court found that Gallegos was properly served. But Plaintiffs dispute that any of them—including either Gallegos or the

3

predecessors-in-interest to Su and St. Maron—was ever given notice prior to the issuance of the challenged injunction. The county court also found Gallegos was the owner of real property adjoining Ella Park; that he was responsible for the increased elevation causing water to stream onto Ella Park; and that he created a public nuisance.

Among other things, the injunction ordered Gallegos to remediate the watershed issue at his own expense and permitted Ella Park to enter the lots or obtain enforcement by contempt of court if Gallegos failed to remediate. Remediating in accordance with the injunction would have required Gallegos to trespass onto the other Plaintiffs' lots.

After Ella Park complained about the continued flooding, the City directed and authorized Public Works to enter the lots to remediate the watershed. Public Works did so. But heavy rains the following year revealed that stormwater did not flow as intended. So once again, Public Works entered the lots without permission, engineering studies, assessments, easements, or condemnation. Public Works used various motorized vehicles and machinery to further modify the lots. These changes caused repeated flooding on the lots, leading to mosquito and snake infestations. They have deprived Plaintiffs of their use of their properties.

Plaintiffs sought the help of Houston's citizens helpline, Public Works, and the City Attorney's Office, but received no response. So they sued in state court. They argued that the injunction the City obtained on behalf of Ella Park was frivolous and based on facts the City knew to be untrue—namely, that Gallegos owned all the lots, and that he caused the increase in elevation.

The City removed when Plaintiffs asserted § 1983 claims, and then moved to dismiss. The district court dismissed the federal claims under

*Monell*.  It dismissed the state law claims as barred by sovereign immunity.  Plaintiffs appealed.

## II.

We begin with the federal claims.  A district court's dismissal under a Rule 12(b)(6) motion is reviewed *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quotation omitted).  In their detailed 44-page complaint, Plaintiffs allege that Houston policymakers enacted an elaborate scheme which led to the unconstitutional taking of their properties without just compensation or due process.  We conclude that Plaintiffs have sufficiently pled claims for municipal liability under § 1983.

"Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotations omitted).  It provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.  Municipalities are persons susceptible to suit under § 1983, but they cannot be found liable on a theory of vicarious liability or respondeat superior.  *Monell*, 436 U.S. at 690–92.

To state a *Monell* claim against Houston, Plaintiffs must plead facts that plausibly establish that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quotation omitted).  *See also Monell*, 436 U.S. at 694.  We consider each of these elements.

First, there are three ways to establish an official policy under *Monell*: (1) written policy statements, ordinances, or regulations; (2) a widespread

No. 22-20019

practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy; or (3) even a single decision may constitute municipal policy in rare circumstances, when the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019). This case falls within the third category.

"If the decision to adopt [a] particular course of action is properly made by th[e] government's authorized decisionmaker, it surely represents an act of official government policy." *Pembaur*, 475 U.S. at 481. This element is met if a plaintiff alleges that a "*deliberate* choice to follow a course of action is made from among various alternatives" by officials responsible "for establishing final policy *with respect to the subject matter in question*." *Garza v. City of Donna*, 922 F.3d 626, 638 (5th Cir. 2019) (quotations omitted).

Here, Plaintiffs allege—and, in some instances, incorporate evidence into their complaint—that:

- The City Council had previously considered at least one other option to remediate the watershed, but chose not to proceed, due to expense.

- The Mayor brought Ella Park's concerns about the watershed before the City Council and directed the City Council to vote on the issue. And the City Council—at the direction of the Mayor—voted to have several city service departments address the issue.

- The Mayor and the City Council ratified the City Attorney's Office's decision to pursue an injunction against Plaintiff Gallegos, "[d]espite an abundance of options" to remediate the issue.

- At least one City Council member thanked the Mayor and City Attorney's Office for the City's "aggressive legal action on behalf of Ella Park."

- Houston filed and litigated the injunction action in the name of Ella Park against Gallegos, despite the City Attorney's Office knowing that Gallegos wasn't the owner of all the lots.

- The Mayor announced on TV that "her legal team [was] throwing the [C]ity's muscle behind [Ella Park's] legal efforts to fix" the issues and authorized the legal team to continue its efforts despite other options.

- The City Council explained that it was trying to assist the Ella Park residents with remediation but needed to resolve some preliminary issues.

- The City Council and City Attorney—relying on the challenged injunction—directed Public Works to enter into and modify the lots. And Public Works explained to Plaintiff Winkler that it acted "with the support" of the Mayor and City Council.

These allegations establish that the Mayor and City Council made the deliberate decision to use City services to get an injunction based on false information, and then use that injunction to justify entering and modifying Plaintiffs' properties. Plaintiffs also specify that this approach was selected from among various options. These allegations are sufficient to establish an official policy under *Monell*.

Second, a plaintiff must "identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 784–85 (1997) (quotation omitted). That inquiry is "dependent on

7

an analysis of state law," because the court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's function under relevant state law." *Id.* at 786.

Houston argues that Plaintiffs have failed to allege this prong because they "do not allege facts that any of the persons making the specific decisions in the City public works or legal departments were final decisionmakers." But this misstates Plaintiffs' claims. Fairly read, the complaint alleges that Houston is liable because the Mayor and City Council directed the City Attorney's Office and Public Works to carry out their unconstitutional scheme. *Cf. Webb*, 925 F.3d at 217 ("Even when an official with final policymaking authority does not directly act to set policy, a municipality may be liable in extreme factual situations when that official ratifies a subordinate's decision, which requires more than the defense of a decision or action shown to be unconstitutional after the fact.") (quotation omitted); *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 286 (5th Cir. 2016) (noting that allegations that a policymaker "ratified an unconstitutional policy" may be enough at the pleading stage and that under some circumstances—like a city spokesman announcement—statements to media may "allow[] for a reasonable pleading inference that [a challenged] policy was attributable to an official policy made by the policymaker of the city").

The Mayor and City Council are final policymakers for the purpose of *Monell* liability. The Houston Charter makes it clear that "[t]he governing body of the City of Houston, Texas, shall be the City Council," and that it "shall be composed of the Mayor and . . . Council Members." HOUSTON, TEX., CHARTER art. V, § 1. It further specifies that "[a]ll administrative work of the city government shall be under the control of the Mayor." *Id.* at art. VI, § 7a. And it establishes that the "Mayor shall have and exercise such powers, prerogatives and authority, acting independently of or in concert

with the City Council, as are conferred by the provisions of this Article or as may be conferred upon him by the City Council." *Id.* at art. VI, § 7.

Plaintiffs have plausibly alleged that the Mayor and City Council directed and ratified the unconstitutional actions of City departments, and the Houston Charter makes clear the Mayor and City Council have policymaking authority. These allegations are sufficient to establish an official policymaker under *Monell*.

Third, a plaintiff must allege "a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). A plaintiff must also show "the requisite degree of culpability," which is at least "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quotations omitted).

Here, Plaintiffs allege that Houston infringed on their rights to just compensation under the Takings Clause of the Fifth Amendment, as well as procedural due process and equal protection under the Fourteenth Amendment.

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2167 (2019). Generally, a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time." *Id.* at 2168. Even temporary physical invasions into private property constitute *per se* physical takings, warranting compensation. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2080 (2021).

Plaintiffs allege that Houston entered their properties on multiple occasions and modified them by relying on the challenged injunction. The allegations support the inference that the challenged injunction gave Houston a justification to enter the lots without permission. And although it's fair to note that the City would've had an independent right to enter the lots if they had been declared a public nuisance, that doesn't alter the analysis. After all, the county court only declared the lots a public nuisance *in the challenged injunction*—meaning there wouldn't have been an independent right to enter without the alleged scheme.

Plaintiffs argue that they were deprived of their Fourteenth Amendment rights because none of them "were given notice or an opportunity to be heard prior to the taking of their property by [Houston] under the guise of a declaration of nuisance." Even assuming that Gallegos was properly served, there are sufficient allegations to support the inference that Houston violated the due process rights of the other property owners.

Procedural due process guarantees an "opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up). Plaintiffs alleged that, even though the City was aware that people other than Gallegos owned the lots, it directed the injunction case against him alone. As a result, the other lot owners had no opportunity to defend against the challenged injunction. Considering that the challenged injunction declared the lots a public nuisance and commanded Gallegos (or Ella Park) to enter into them in order to remediate the watershed, this amounts to a significant constitutional deprivation. It demonstrates "deliberate indifference to the known or obvious fact" that a constitutional violation of the rights of the other property owners would result. *Webb*, 925 F.3d at 219.

* * *

Plaintiffs have specifically alleged each of the elements of a *Monell* claim. Accordingly, the district court erred in dismissing the § 1983 claims.

## III.

We now turn to the state law claims. A district court's determination of subject-matter jurisdiction is reviewed de novo. *See In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012).

"Sovereign immunity is jurisdictional." *Cozzo v. Tangipahoa Par. Council—President Gov't*, 279 F.3d 273, 280 (5th Cir. 2002). Sovereign immunity protects Texas and its political subdivisions—including municipalities like Houston—from suits for money damages. *See Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429 (Tex. 2016) (*Wasson I*).

When it comes to the sovereign immunity of municipalities in tort actions, the Texas Supreme Court "has distinguished between those acts performed as a branch of the state and those acts performed in a proprietary, non-governmental capacity." *Id.* at 430. Plaintiffs argue that sovereign immunity is nonexistent here because Houston was acting in a propriety capacity since the City was acting on behalf of Ella Park—a group of private citizens.

"[G]enerally speaking, a municipality's proprietary functions are those conducted in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government, while its government functions are in the performance of purely governmental matters solely for the public benefit." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (quotation omitted). Although this rule is well settled, the Texas Supreme Court has recognized that difficulties may arise depending on the particular

fact pattern presented. *See City of Houston v. Shilling*, 240 S.W.2d 1010, 1012 (1951).

The Texas Constitution authorizes the Legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law." Tex. Const. art. XI, § 13(a). Texas courts "are very hesitant to declare immunity nonexistent," and thus "carefully consider the statutory landscape before doing so." *Wasson I*, 489 S.W.3d at 437–38 (quotation omitted).

The Texas Tort Claims Act includes "sanitary and storm sewers" in its non-exhaustive list of governmental functions. Tex. Civ. Prac. & Rem. Code § 101.0215(a)(9). *See also City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997) (acknowledging that prior to amendments to the Texas Tort Claims Act, common law classified storm sewer maintenance as proprietary). And under Texas law, the fact that the Texas Tort Claims Act lists "sanitary and storm sewers" as a governmental function is dispositive. *See Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 171 n.38 (Tex. 2013) (noting the "legislative interpretation of 'governmental functions'" is "binding" in the "context of the Tort Claims Act"). The Act explicitly states that the "proprietary functions of a municipality do not include those governmental activities listed." Tex. Civ. Prac. & Rem. Code § 101.0215(c). So "[i]f a function is included in the nonexclusive list of governmental functions, it has been deemed governmental in nature by the legislature and [courts] have no discretion or authority to hold otherwise." *Roger v. City of Houston*, 627 S.W.3d 777, 794 (Tex. App.—Houston 2021, no pet.). Because the Texas Tort Claims Act establishes that "sanitary and storm sewers" are governmental functions, Plaintiffs' argument is foreclosed here. *A.P.I. Pipe,* 397 S.W.3d at 171 n.38.

No. 22-20019

Alternatively, Plaintiffs make various arguments that Texas has waived sovereign immunity for the claims here. None succeed.

To begin with, Plaintiffs argue that, even if Houston was acting within a governmental capacity, it waived immunity by interjecting itself in damages-seeking litigation. "[I]f the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." *Reata Construction Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006).

But *Reata* establishes a narrow exception. In *Reata*, the City of Dallas intervened in a negligence dispute to seek damages from a third-party claimant. *Id.* at 373. It then invoked sovereign immunity in response to the third-party claimant's claim against it. *Id.* The Texas Supreme Court recognized that "it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it." *Id.* at 375–76. "If the opposing party's claim can operate only as an offset to reduce the government's recovery [under its own claim], [then] no tax resources w[ould] be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted." *Id.* at 375. So Dallas did not have immunity from suit as to counter-claims "which [we]re germane to, connected with, and properly defensive of the City's claims, to the extent [the counter-claimant's] claims offset those asserted by the City." *Id.* at 373.

*Reata*'s narrow holding doesn't encompass the situation in this case. Here Plaintiffs claim that Houston acted on behalf of private citizens in their efforts to seek damages (and remediation) from Gallegos. They're not alleging that Houston sought damages in a way that would offset the fiscal impacts of being subject to suit.

13

No. 22-20019

Plaintiffs' other arguments fare no better.

"In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *DART v. Whitley*, 104 S.W.3d 540, 541 (Tex. 2003). And "a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." Tex. Gov't Code § 311.034.

The Texas Tort Claims Act provides only a limited waiver for claims arising out of negligence. It waives immunity for "the property damage . . . [that] arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and . . . the employee would be personally liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021(1). Here, the injury is the taking of the property without compensation or due process, which was not caused by the use of motor vehicles. The district court did not err in dismissing the negligence claim.

Two of Plaintiffs' claims are for intentional torts—trespass and civil conspiracy. *See Harris Cnty. v. Cypress Forest Pub. Util. Dist.*, 50 S.W.3d 551, 553 (Tex. App.—Houston 2001) (trespass); *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996) (civil conspiracy). The Texas Tort Claims Act doesn't apply to any claim "arising out of assault, battery, false imprisonment, or *any other intentional tort*." Tex. Civ. Prac. & Rem. Code § 101.057(2) (emphasis added). So the district court did not err in dismissing the trespass and civil conspiracy claims.[1]

---

[1] The district court dismissed the statutory claim for use of fraudulent court records. Aside from their argument regarding the applicability of *Reata* to this case, Plaintiffs don't address this issue in their opening brief. They have therefore abandoned any other argument on this claim. *See Yohey v. Collins*, 985 F.3d 222, 224–25 (5th Cir. 1993). Moreover, at no point have Plaintiffs shown a waiver of immunity for claims under this statute. The district court properly dismissed this claim.

No. 22-20019

\* \* \*

We affirm the district court's dismissal of the state tort and statutory claims against Houston.  We reverse and remand the dismissal of the § 1983 claims against Houston.

---

Plaintiffs also asserted state law claims against Ella Park, which the district court likewise dismissed.  Because neither party briefed this issue and Ella Park never appeared at the district court, it's not properly before us.