# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 7, 2025

Lyle W. Cayce
Clerk

No. 24-50096

―――――――――――

Odis Jones,

*Plaintiff—Appellee*,

*versus*

City of Hutto,

*Defendant—Appellant*.

―――――――――――――――――――――――――――

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-1210

―――――――――――――――――――――――――――

Before Richman, Graves, and Ramirez, *Circuit Judges*.
Priscilla Richman, *Circuit Judge*:

Odis Jones, a black man, ended his tenure as City Manager of Hutto, Texas under a separation agreement that provided him with a severance payment, a non-disparagement provision, and other contractual rights. This parting of ways came as a result a prolonged conflict, primarily with Councilmembers Mike Snyder and Tanner Rose, that bore an alleged racial character. After Jones's departure, councilmembers allegedly disparaged him, and the City Council ultimately voted to rescind the separation agreement. The City of Hutto argues this was pursuant to a legal opinion by the City Attorney that the agreement was void or voidable. Jones argues it

was because of racial animus and that the City's actions have severely affected his employment prospects.

Jones brought a 42 U.S.C. § 1981 claim, alleging a racially motivated impairment of his contract rights and a breach of contract claim under Texas law.  The jury found for Jones on both claims, and the district court entered a judgment in favor of Jones.  We affirm the district court's judgment in part, reverse in part, and remand for further proceedings.

## I

## A

The City of Hutto hired Odis Jones as its first black city manager in 2016.  Jones worked closely with the seven elected members of the Hutto City Council.  The City, a neighbor of Austin, felt the effects of the larger city's growth.  This caused a rift in local politics between the "pro-growth" and "anti-growth" factions.  The "pro-growth" faction wanted to attract development and businesses and the "anti-growth" faction was concerned that development would affect the City's culture and infrastructure.  Jones aligned himself with the "pro-growth" contingent.  He led efforts that included improving the City's water system, restructuring the police department, and bringing a $1.5 billion development project to the City, the largest in its history.

Jones was not without opposition, however.  In May 2019, two new "anti-growth" councilmembers, Mike Snyder and Tanner Rose, won election after mounting campaigns allegedly aimed at "get[ting] rid of the city manager and his staff."  Snyder's frustration with Jones initially concerned a perceived lack of transparency and suspicion of improper dealing.  Later, two investigations unearthed no impropriety by Jones.  Tensions mounted that took on an alleged racial character and Jones reported race-based discrimination by Snyder and Rose to the City Council in August

2019. The situation did not resolve and the parties began to discuss parting ways. In November 2019, the City Council entered into a separation agreement with Jones by a five-vote majority (5-1), noting the split was "without cause." Rose cast the lone "nay" vote and Snyder was absent and did not vote. In accordance with Jones's employment agreement, the separation "without cause" provided him with twelve months of salary and health benefits, $412,000 in total. The separation agreement also contained a mutual non-disparagement clause and a mutual waiver of then-existing legal claims.

The next day, the City released a statement announcing this news and praising Jones for his tenure as City Manager. Snyder and Rose, however, voiced their dissenting opinions in a "press release" posted to Snyder's candidacy Facebook page. Jones alleges this began a "campaign" by Snyder and Rose to have the City Council retract the separation agreement. Ultimately, in December 2020, the Council unanimously voted to adopt a resolution that purportedly rescinded the separation agreement pursuant to a legal opinion by the City Attorney that it was defectively executed and thus void. The City argues it focused on the separation agreement's validity because the City was experiencing a budget shortfall and an audit identified the agreement as a cost. After the City voted to rescind the agreement, the City Attorney sent the resolution and a demand letter to Jones demanding the return of $412,000 received under the separation agreement.

A week later, Jones filed this suit in federal court. By trial, the claims had narrowed to a civil rights claim under 42 U.S.C. § 1981 and a state-law breach of contract claim. The parties both moved for summary judgment on the separation agreement's validity; the court granted Jones's motion, declaring the contract valid and enforceable. The case then proceeded to trial. At the close of evidence, the City moved for judgment as a matter of law under Rule 50(a), which the court denied. The court submitted Jones's

§ 1981 and Texas breach of contract claims to the jury. The jury returned a verdict for Jones on both claims, awarding him $8 million for the § 1981 claim and $4.5 million for breach of contract, upon which the court entered final judgment.

The City filed a renewed motion for judgment as a matter of law under Rule 50(b) and a motion for new trial or remittitur under Rule 59.[1] The court denied the renewed motion for judgment as a matter of law but suggested remittitur because a statute barred all breach of contract damages except for attorney fees and Jones did not segregate his attorney fees between the claims, risking double recovery. The court suggested that Jones seek attorney fees by post-trial motion. Jones accepted remittitur totaling $5 million and filed a motion for attorney fees. The City now appeals the denial of judgment as a matter of law as to both the § 1981 claim and the breach of contract claim.

**B**

We review the district court's denial of judgment as a matter of law *de novo*.[2] We apply the same standard as the district court, found in Rule 50(a), directing judgment as a matter of law if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[3] Here, we should reverse the district court "only if 'the facts and inferences point so strongly and overwhelmingly in favor of [Hutto]'" that it was

---

[1] Fed. R. Civ. P. 50(b), 59.

[2] *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 624 (5th Cir. 2008).

[3] Fed. R. Civ. P. 50(a).

unreasonable for the jury to find for Jones.[4]  Deference to the trier of fact requires us to "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party," Jones.[5]

## II

For Jones's civil rights claim, there are two statutes in play: 42 U.S.C. §§ 1981 and 1983.  First, § 1981 protects, among other rights, the right "to make and enforce contracts"[6] against discriminatory "impairment."[7] Subsection (b) broadly defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[8]

However, because § 1981 does not provide an independent cause of action against local government entities, plaintiffs must bring a claim under 42 U.S.C. § 1983.[9]  Under § 1983, municipalities "cannot be found liable on a theory of vicarious liability or respondeat superior."[10]  So, the unconstitutional conduct must be "directly attributable to the municipality through some sort of official action or imprimatur," whereas "isolated

_____

[4] *Broussard*, 523 F.3d at 624 (quoting *Brown v. Bryan County*, 219 F.3d 450, 456 (5th Cir. 2000)).

[5] *Id.* (quoting *Brown*, 219 F.3d at 456).

[6] 42 U.S.C. § 1981(a).

[7] 42 U.S.C. § 1981(c).

[8] 42 U.S.C. § 1981(b).

[9] *Oden v. Oktibbeha County*, 246 F.3d 458, 462-63 (5th Cir. 2001).

[10] *St. Maron Props., L.L.C. v. City of Hous*, 78 F.4th 754, 759-60 (5th Cir. 2023) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

No. 24-50096

unconstitutional actions by municipal employees will almost never trigger liability."[11]  To prevail, a plaintiff must establish that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."[12]

## A

Jones satisfies § 1983's requirements.  For the first prong, "written policy statements, ordinances, or regulations" suffice to establish a municipal policy for purposes of liability.[13]  The Supreme Court has held that a single decision "may represent 'an act of official government policy'" if made by an authorized decisionmaker.[14]  Here, the resolution adopted by the City Council rescinding the separation agreement is such a policy.[15]

Next, a "policymaker" is the person or entity that "possesses final authority to establish municipal policy with respect to the action ordered."[16]  This is a question of state law, aided by looking at relevant municipal charters.[17]  Hutto's Charter provides "all powers of the City . . . shall be vested in an elected council, . . . the 'City Council,' which shall enact local legislation, adopt budgets, determine policies and appoint the City Manager" and "vest[s] all authority . . . of [City Manager] suspension or removal in the

---

[11] *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019).

[12] *Id.*

[13] *Id.* at 215.

[14] *Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 165 (5th Cir. 2016) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)).

[15] *See, e.g.*, *Owen v. City of Independence*, 445 U.S. 622, 628-29 (1980) (City Council passed resolution firing plaintiff).

[16] *Brady v. Fort Bend County*, 145 F.3d 691, 698 (5th Cir. 1998) (quoting *Pembaur*, 475 U.S. at 484).

[17] *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 761 (5th Cir. 2023).

City Council." Here, the policymaker for the resolution is the Hutto City Council.

Lastly, regarding § 1983, we have treated "moving force" as a "direct causal link between the municipal policy and the constitutional deprivation."[18] Here, there is no question on the link between the policy (the resolution) and the deprivation (the impairment of contract rights); the resolution is the very instrument that purported to void Jones's rights under the separation agreement.

**B**

Advancing from § 1983, a § 1981 plaintiff must establish: "(1) [H]e is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute."[19] Jones is black, and the parties do not dispute this element. Elements two and three are in contest. The claim resolves on whether the impairment, if any, was racially motivated.

To prevail on his § 1981 claim, Jones must "ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right."[20] Importantly, "[a] plaintiff can prove intentional discrimination through either direct or circumstantial evidence" as direct evidence of racial discrimination is often scarce.[21] In addition, because of *Monell*'s[22] bar on *respondeat superior* in § 1983 claims against municipalities, Jones must show

---

[18] *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001).

[19] *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931 (5th Cir. 2021).

[20] *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

[21] *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).

[22] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

No. 24-50096

that the "animus is [] chargeable to the [b]oard itself."[23]  Jones argues that discriminatory intent is demonstrated by either (1) a headcount analysis or (2) a "cat's paw" analysis.  Jones's claim fails.

**1**

Under a headcount analysis, Jones must present sufficient evidence demonstrating race was a but-for reason of a "majority" (four of the six) of the councilmembers' votes to rescind the separation agreement.[24]  Jones argues at length that both Councilmembers Snyder and Rose bore racial animus due to several comments and interactions.  We assume *arguendo* that Snyder and Rose did act from animus.

Councilmember Robin Sutton won a seat on the City Council after the separation agreement and voted in favor of the resolution.  Prior to her election, she vocally supported Snyder and Rose and opposed Jones at City Council meetings.  She won election after councilmembers resigned their positions because of alleged "harassment" from the "anti-Odis" contingent.  None of these instances cited by Jones contain anything indicating racial animus chargeable to Sutton.

Councilmembers Patti Martinez and Peter Gordon are similarly situated.  Both voted for the resolution despite having voted for the separation agreement.  Martinez and Gordon joined with Snyder on post-Jones actions including opening an investigation into the City Manager role, initiating a forensic audit after Jones departed, and launching an investigation into the separation agreement.  As with Sutton, these instances of agreement

---

[23] *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016).

[24] *Griggs v. Chickasaw County*, 930 F.3d 696, 704 (5th Cir. 2019).

with Snyder and Rose do not support the inference of racial animus chargeable to Martinez or Gordon.

Lastly, Jones does not argue that Councilmember Daniel Thornton bore animus. In sum, even assuming *arguendo* that Snyder and Rose bore animus, Jones cannot establish animus chargeable to the board on a headcount analysis.

**2**

Jones invokes a "cat's paw" theory establish the City's liability. The cat's paw doctrine, used in employment discrimination cases, holds an employer liable "even if the ultimate decisionmaker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus."[25] However, the doctrine does not apply in the present suit.

Outside of § 1983 suits, we have held that the cat's paw doctrine serves to "impute" the illicit motives of an earlier actor to the official decisionmaker.[26] Jones similarly describes the cat's paw as "imput[ing] [discriminatory] attitudes." This "imputation of motives" language appears to reveal some potential daylight between *respondeat superior* and cat's paw. After all, as Jones argues, if cat's paw imputes only the motives of the prior actor to the decisionmaker, perhaps cat's paw liability is ultimately predicated on the decisionmaker's final action and is not vicariously imposed

---

[25] *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017).

[26] *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir.2000) ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (arguing motives "should be imputed [] under the cat's paw analysis").

from the earlier actor's conduct. However, a close inspection of the theory's headwaters reveals the cat's paw is based in agency principles. It is thus incompatible with *Monell* and unavailable to Jones in this suit.

JUDGE POSNER has been credited for terming the cat's paw doctrine.[27] In *Shager v. Upjohn Co.*,[28] an ADEA case, former employee Shager brought an age discrimination claim against his former employer after his supervisor, who allegedly held age-related animus, recommended Shager's termination to a personnel committee.[29] If the supervisor had directly fired Shager, the employer would have been found liable under *respondeat superior*.[30] The insertion of the committee presented a causation problem because the committee fired Shager, not the supervisor with the alleged animus.[31] But the supervisor's influence overcame the interruption of the committee with tort causation and agency principles:

> If [the committee] acted as the conduit of [the supervisor's] prejudice—his cat's-paw—the innocence of its members would not spare the company from liability. For it would then be a case where [the supervisor], acting within (even if at the same time abusing) his authority as district manager to evaluate and make recommendations concerning his subordinates, had procured Shager's discharge because of his age.[32]

---

[27] *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 n.1 (2011).

[28] 913 F.2d 398 (7th Cir. 1990).

[29] *Id.* at 400.

[30] *Id.* at 405.

[31] *Id.*

[32] *Id.*

If there was any ambiguity as to cat's paw's basis in *respondeat superior*, Judge Posner plainly follows with: "[The supervisor] would have violated the statute, and his violation would be imputed to [the employer]."[33] The action is imputed, not the motive.

The Supreme Court later blessed cat's paw in a USERRA case, *Staub v. Proctor Hospital*.[34] The Court reviewed general tort and agency principles before asserting, "[an] employer is at fault [if] one of its *agents* committed an action based on discriminatory animus that was intended to cause, and *did in fact cause*, an adverse employment decision."[35] Again, *Staub* does not base cat's paw on imputing the motive of the earlier actor.[36] Rather, liability attaches to the employer "under traditional agency principles."[37] *Shager* and *Staub* agree: The cat's paw preserves the casual link between an earlier agent's discriminatory action and a neutral decisionmaker's adverse action; then, agency principles attribute the earlier agent's action to the employer.

In a pre-*Staub* unpublished case, we clearly spelled out the mechanics of cat's paw in a case against an individual, not an employer:

> In the employment context, the actions of ordinary, non-supervisory employees are not typically a basis for a claim. An

---

[33] *Id.*

[34] 562 U.S. 411 (2011).

[35] *Id.* at 421 (emphasis added).

[36] *Id.* at 418 ("The Restatement of Agency suggests that the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a tort that requires both.").

[37] *Id.* at 422 n.4 ("Needless to say, the employer would be liable only when the supervisor acts within the scope of his employment, or when the supervisor acts outside the scope of his employment and liability would be imputed to the employer under traditional agency principles.").

exception is where the decision-maker functions as the ordinary employee's "cat's paw" such that the adverse employment decision could fairly be attributed *to the employee*.[38]

Thus, despite our several cases describing "imputed motives," we have acknowledged that cat's paw is a "theory of causation"[39] that connects a bad actor to an adverse action when the decisionmaker is an intermediary, then, if applicable, agency law attributes the action of the bad actor to an employer.

Our confusing language of "imputing motives" seems to pre-date *Staub* and continue after it.[40] This phrase may have originated from *Long v. Eastfield College*,[41] a Title VII case, which stated that in some cases "the wrongful intent on the part of the supervisory employee is properly imputable

---

[38] *Land v. Dietz*, 276 F. App'x 384, 387-88 (5th Cir. 2008) (unpublished) (emphasis added) (internal citation omitted).

[39] *Harville v. City of Houston*, 945 F.3d 870, 878 n.30 (5th Cir. 2019); *see also Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015) (noting the "cat's paw theory of causation"); *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) ("[W]hen the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact.").

[40] *See, e.g.*, *Sims v. City of Madisonville*, 894 F.3d 632, 640 (5th Cir. 2018) (noting cat's paw is about "imputing . . . the unlawful motives of employees who are not final decisionmakers"); *Okon v. Harris Cnty. Hosp. Dist.*, 426 F. App'x 312, 318 (5th Cir. 2011) (unpublished) ("Prior to *Staub*, our court had recognized this . . . 'cat's paw' exception, which allows for imputation of the tainted motives of a subordinate to the policymaker . . . ."); *Gollas v. Univ. of Tex. Health Sci. Ctr.*, 425 F. App'x 318, 325 (5th Cir. 2011) (unpublished) (noting a "retaliatory motive may be imputed to the ultimate decisionmakers, thereby establishing a causal link"); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (noting cat's paw functions to "impute illicit motives"); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (noting cat's paw "impute[s] [] discriminatory attitudes to the formal decisionmaker").

[41] 88 F.3d 300 (5th Cir. 1996).

to the employer."[42]  As this statement came directly after citing *Shager*'s explication of the *respondeat superior* principles underlying the theory, *Long*'s "imputation of intent" language is best understood as imprecision.[43]

Given the tension between cat's paw and *Monell*'s bar on vicarious liability, we have been extremely wary of applying the theory to *Monell* claims. Jones does not cite any case in which the Fifth Circuit applied cat's paw to a *Monell* claim and we are similarly unaware of any such authority.[44]  In fact, our cases impliedly reject the theory in *Monell* contexts.  In *Howell*,[45] we acknowledged that "the 'cat's paw' theory of liability allows a final decisionmaker to be held liable if his or her decision is influenced by a subordinate's retaliatory animus," but noted the plaintiff's two routes in establishing liability against the municipality were proving "that the Board itself harbored retaliatory animus, or that it ratified both [the supervisor's] recommendation for discharge and the retaliatory animus backing it."[46]  This amounts to a headcount route and a ratification route (following *Beattie*,[47] a case the City addresses, but Jones does not), not cat's paw.  In an unpublished decision, we again implicitly rejected cat's paw in *Monell* claims: "It is the formal allocation of power—not the way power is exercised 'in practice'— that matters for municipal liability under Section 1983" because otherwise "municipalities [could] be held liable under Section 1983 on what would

_____

[42] *Id.* at 307.

[43] *See id.*

[44] *Edelstein v. City of Brownsville*, No. 20-40211, 2021 WL 4096581, at *2 (5th Cir. Sept. 8, 2021) (unpublished) (acknowledging the district court "noted that [the Fifth Circuit] had not previously applied [the cat's paw] theory in the context of Section 1983").

[45] *Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016).

[46] *Id.* at 526, 528.

[47] *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595 (5th Cir. 2001).

operate in practice as a *respondeat superior* theory—something the Supreme Court has repeatedly forbidden."[48]  A district court in our circuit more explicitly denounced cat's paw's application to *Monell* claims.[49]

Other circuits are similarly wary of extending cat's paw to *Monell*.  In an extended discussion in a footnote, the Seventh Circuit stated:

> [The plaintiff] makes a passing reference to the "cat's paw" theory, but we question whether such a theory is applicable for purposes of establishing § 1983 municipal liability. . . . The theory is steeped in agency principles which are applied in the Title VII context, but don't apply to § 1983 municipal liability. We were unable to find any other case applying the cat's paw theory to hold a municipality liable under § 1983. . . . Imputing a nondecisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability. Given that well developed § 1983 municipal liability law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the cat's paw concept in this area of civil rights law.[50]

---

[48] *Edelstein*, 2021 WL 4096581, at *4 (emphasis omitted).

[49] *Perez v. City of Austin*, No. A-07-CA-044, 2008 WL 11334097, at *5 (W.D. Tex. Sep. 2, 2008) (order granting in part and denying in part defendant's motion for summary judgment) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128-30 (1988) (plurality opinion)) ("Allowing a Plaintiff to bring suit under § 1983 for employment discrimination, and then permitting him to avoid the *Monell* doctrine by use of [the cat's paw] doctrine would plainly be permitting circumvention of established principles. Thus, the 'cat's paw' theory cannot solve the Plaintiff's problem with being unable to demonstrate the existence of a policy or practice which caused Plaintiff's termination.").

[50] *Waters v. City of Chi.*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) (internal citations omitted).

No. 24-50096

The Seventh Circuit re-urged its concern in a later case.[51]  Similarly, on the Tenth Circuit, then-JUDGE GORSUCH cast doubt as to whether cat's paw squares with *Monell* in an unpublished opinion.[52]  District courts across the circuits more clearly deny cat's paw in *Monell* claims.[53]

_____

[51] *Simstad v. Scheub*, 816 F.3d 893, 902 (7th Cir. 2016) ("It is not clear how, or whether, [cat's paw] applies in the municipal liability context.").

[52] *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 795 (10th Cir. 2014) (GORSUCH, J.) (unpublished) (holding that the plaintiff failed to "show that holding the school district and board liable under this cat's paw theory doesn't run afoul of *Monell*'s teaching on municipal liability").

[53] *Talanca v. Borough of Ashley*, No. 3:18-CV-2184, 2021 WL 10382134, at *3 (M.D. Pa. Nov. 22, 2021) (quoting *Migliore v. Feria*, No. CV 11-4018, 2015 WL 7273383, at *9 (E.D. Pa. Nov. 17, 2015)) ("[C]at's paw liability is not available in a § 1983 action against a municipality."); *Gray v. Zaruba*, No. 16 C 4850, 2019 WL 5536839, at *11 (N.D. Ill. Oct. 25, 2019) (noting "[i]t is highly questionable whether a party may even rely on a cat's paw theory to establish the liability of a municipality . . . for such a claim" before deciding not to reach the issue); *Harper v. Hous. Cnty. Bd. of Educ.*, No. 1:17-CV-721, 2019 WL 3072631, at *7 (M.D. Ala. July 12, 2019) ("Rejecting the cat's paw theory for Section 1983 litigation supports the Supreme Court's holding in *Monell*."); *Nicosia v. Town of Hempstead*, No. 16CV1176, 2017 WL 3769246, at *4 (E.D.N.Y. Aug. 28, 2017) (declining to extend cat's paw to § 1983 in light of plaintiff's lack of support); *Sroga v. Preckwinkle*, No. 14 C 06594, 2017 WL 345549, at *6 (N.D. Ill. Jan. 24, 2017) (quoting *Praprotnik*, 485 U.S. at 131) ("Allowing an expansion of *Monell* via the cat's paw theory would be 'a step towards overruling *Monell* and adopting the doctrine of *respondeat superior*.'"); *Chew v. City & County of San Francisco*, No. 13-CV-05286, 2016 WL 631924, at *15 (N.D. Cal. Feb. 17, 2016), *aff'd*, 714 F. App'x 687 (9th Cir. 2017) ("[Plaintiff] cannot rely on the Cat's Paw theory as elucidated in *Staub* to impute liability to the City and circumvent the requirements of *Monell*."); *Schmidt v. Vill. of Glenwood*, No. 14 C 9112, 2015 WL 3918952, at *6 (N.D. Ill. June 24, 2015) ("[The] 'cat's paw' theory of liability is not a good fit under *Monell*."); *Polion v. City of Greensboro*, 26 F. Supp. 3d 1197, 1218 (S.D. Ala. 2014), *aff'd*, 614 F. App'x 396 (11th Cir. 2015) (declining to apply cat's paw to municipal liability); *Kregler v. City of New York*, 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013), *aff'd*, 604 F. App'x 44 (2d Cir. 2015) (declining to extend cat's paw to § 1983 municipal liability); *Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1222 (N.D. Ala. 2012) (quoting *Files v. DeKalb Cnty. Sch. Dist.*, No. 1:11-CV-1798, 2012 WL 716055, at *4 (N.D. Ga. Mar. 5, 2012)) ("[T]he cat's paw theory does not apply in the § 1983 context."); *Manuele v. City of Jennings*, No. 4:10CV1655, 2012 WL 113538, at *10 (E.D. Mo. Jan. 13, 2012) ([C]at's paw liability does not apply to municipalities, which cannot be held liable on agency principles."). *But see*

No. 24-50096

\* \* \* \* \*

In sum, Jones advances a headcount theory and a cat's paw theory. Even assuming *arguendo* that Snyder and Rose bore animus, Jones has not established the discriminatory intent of any of the remaining four councilmembers, so the headcount fails. Second, the cat's paw claim is based in agency principles, so it is incompatible with *Monell*'s bar on *respondeat superior* and unavailable to Jones. Jones did not establish this element of his civil rights claim and the district court's judgment must be reversed as to this claim.

## III

The City also argues that the district court erred in concluding that the agreement with Jones was valid. The City also contends that the jury's finding of breach of contract liability should be reversed.

## A

We first consider whether certain issues are preserved for review. The parties submitted competing motions for summary judgment as to contract validity, and the district court granted Jones's motion, upholding the validity of the separation agreement. Jones argues that the City must have re-urged its argument on this point to preserve it for appeal, but that is inaccurate. The Supreme Court held in *Dupree v. Younger*,[54] that "a post-trial motion under Rule 50 is not required to preserve for appellate review a purely legal issue resolved at summary judgment."[55] To the extent the City's

---

*Bonner v. Vill. of Burnham*, No. 14 C 1881, 2014 WL 3882501, at \*4 (N.D. Ill. Aug. 7, 2014) (allowing *Monell* claim to proceed via cat's paw despite recognizing the Seventh Circuit's caution against it).

[54] 598 U.S. 729 (2023).

[55] *Id.* at 736.

arguments present questions of law, we can consider them.  On appeal, the City brings three arguments on contract validity: (1) a Texas Open Meetings Act (TOMA) violation, (2) a City Charter violation, and (3) immunity.

**B**

The City argues that the separation agreement is voidable under TOMA.  The City directly made this argument, a question of law, in its motion for summary judgment.[56]  We can now review it.

TOMA, aimed at "enabl[ing] public access to and [] increas[ing] public knowledge of government decisionmaking,"[57] requires a "governmental body [to] give written notice of the date, hour, place, and subject of each meeting held by the governmental body."[58]  The City argues that the meeting that concerned the separation agreement failed this requirement by insufficiently disclosing the subject matter of the action that was to be considered regarding Jones.

The parties agree that the public notice on the action item was: "Consideration and possible action(s) on personnel matters regarding city manager."  If a generalized "'reader' is given notice, the requirement of [TOMA] is satisfied and its purpose served."[59]  While notice may not be "as

---

[56] *Weatherford v. City of San Marcos*, 157 S.W.3d 473, 486 (Tex. App.—Austin 2004, pet. denied) ("[A]dequacy [of notice under TOMA] is a question of law.").

[57] *City of San Antonio v. Fourth Ct. of Appeals*, 820 S.W.2d 762, 765 (Tex. 1991).

[58] Tex. Gov't Code § 551.041.

[59] *City of San Antonio*, 820 S.W.2d at 765.

clear as it might be,"[60] it is sufficient when "it alerts a reader that some action will be taken relative to a topic."[61]

The City correctly notes that "as public interest in a matter increases, the Act requires correspondingly more detailed descriptions of the subject to be discussed."[62] It argues that because the separation agreement involved "secret payment of an unbudgeted $412,000 . . . , a release *by the City* of all claims *the City might have* against Jones . . . ; a post-employment confidentiality provision . . . ; [and] a non-disparagement provision purporting to waive the City's governmental immunity," it required more specific notice to comply with TOMA. In *Cox Enterprises*,[63] cited by the City, a school board was considering filling the position of superintendent but only described the action in the agenda as relating to "personnel."[64] Because the issue was of special interest to the public, the court held that notice was insufficient under TOMA.[65] The court noted that the notice "should specifically disclose the subjects to be considered at the upcoming meeting."[66]

---

[60] *Id.*

[61] *Rettberg v. Tex. Dep't of Health*, 873 S.W.2d 408, 411 (Tex. App.—Austin 1994, no writ) (citing *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 646 (Tex. 1975)).

[62] *Stockdale v. Meno*, 867 S.W.2d 123, 125 (Tex. App.—Austin 1993, writ denied) (citing *Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.*, 706 S.W.2d 956, 959 (Tex. 1986)).

[63] *Cox Enters., Inc.*, 706 S.W.2d at 956.

[64] *Id.* at 957.

[65] *Id.* at 959.

[66] *Id.*

Here, notice went beyond the general "personnel" descriptor in *Cox Enterprises*. The notice specifically indicated that action was contemplated "on personnel matters *regarding city manager*." The specification of the subject of the personnel matters differentiates this case from *Cox Enterprises*. The City cites no case that demonstrates that the added specificity, "regarding city manager," is insufficient under the notice requirement. Furthermore, "[f]ar from serving the purposes of the Act, [too high of a] degree of specificity would so overwhelm readers" and prove less informative than a leaner notice.[67] We are persuaded that the notice in this case satisfied TOMA. Notably, neither party cited a case where a municipality challenged its *own* TOMA violation. Because the City's notice was sufficient, we do not consider whether and under what circumstances a city could void its own action under TOMA.

## C

The City asserts that the severance agreement is void under § 8.10 of the City Charter, an overspending provision. That provision requires that "[n]o payment shall be made . . . except in accordance with authorized appropriations and *unless the City Manager or his designee first certifies that there is a sufficient unencumbered balance . . . and that sufficient funds are or will be available*" to cover the claim when it becomes due. Hutto argues that there was no certification for the funds to be expended under the separation agreement, voiding the agreement.

While § 8.10 appears throughout the record as it was one of the bases for the resolution in the City Attorney's demand letter, this argument was not made in either the City's Motion for Summary Judgment or its Renewed

---

[67] *City of San Antonio v. Fourth Ct. of Appeals*, 820 S.W.2d 762, 766 (Tex. 1991).

Motion for Judgment as a Matter of Law.  Consequently, this argument is forfeited.[68]

The City argues that the non-disparagement provision is invalid because of immunity, even if the rest of the contract is enforceable.  Because the validity of the non-disparagement provision has no bearing on the issues on appeal, we need not consider it.

**D**

Jones argues the City breached the separation agreement by (1) adopting the resolution rescinding the separation agreement and sending the associated demand letter and (2) disparaging Jones in violation of the non-disparagement provision.

Hutto argues that its attempted recission of the separation agreement did not impair Jones's contract rights because Jones received and retains the $412,000 promised under the contract and, while Hutto demanded return of the payment and threatened suit, it made no counterclaim for the return of the money.  This rings hollow.

The City continues to argue before this court that the separation agreement was invalid and was properly rescinded.  The district court ruled against the City on the issues of contract validity and breach at the summary judgment stage.  Jones prevailed on the breach of contract issue in the district court. We agree with the district court that, as a matter of law, the separation agreement was valid regarding the separation payment, and the City breached the agreement when it attempted to rescind.

The jury found the City liable for breach of contract and awarded Jones $4.5 million after the district court instructed it to consider (1) the

---

[68] *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017).

difference in the value contracted for and received, (2) Jones's reasonable and necessary expenses in pursuing the claim, and (3) consequential damages stemming from lost profits or damage to reputation. The Texas Local Government Code provided the waiver of governmental immunity for Jones's breach of contract claim,[69] but the district court, in a post-trial order, correctly noted this statute also limits Jones's recovery. Notably, § 271.153(b) specifically bars recovery of consequential damages.[70] Because of this bar, the trial court correctly noted Jones cannot recover consequential damages.

Though Jones retained the $412,000 payment throughout the proceedings, the City disputed his right to retain that payment. Jones prevailed, and as a consequence, was not required to repay the $412,000. His claim for attorney fees remains.

The City maintains that Jones is not entitled to recover attorney fees because he is not entitled to any damages in light of the fact he never repaid the $412,000. The Supreme Court of Texas has directed that "suits cannot be maintained solely for the attorney's fees; a client must gain something before attorney's fees can be awarded."[71] But Jones did "gain something." He pursued and prevailed on his right to retain the separation payment made under the contract.

As to the breach of contract claim for disparagement, even if we were to conclude that such a claim is not barred by TEX. LOC. GOV'T CODE § 271.153(b), an issue we do not decide, there is no evidence that the City

---

[69] TEX. LOC. GOV'T CODE § 271.152.

[70] *Id.* § 271.153(b).

[71] *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 (Tex. 2009) (referencing *Jarndyce v. Jarndyce* of Dickensian fame).

No. 24-50096

disparaged Jones. Evidence of disparagement by two members of the City Council is not evidence of disparagement by the City or the council as a body. The evidence reflected that disparaging statements by the two council members were made individually, in contexts that could not have been construed as reflecting actions of the City or the City Council.

Accordingly, we remand this case to the district court to consider only the attorney's fee issue.

\*    \*    \*

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for proceedings consistent with this opinion.